Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              WESTERN DISTRICT OF MISSOURI
 3                    CENTRAL DIVISION
 4
 5   KEVIN LEDFORD, individually and
     on behalf of all others
 6   similarly situated,
                                      Case No.
 7        Plaintiff,                  2:23-cv-04079-BCW
 8   vs.
 9   TRAVELERS HOME AND MARINE
     INSURANCE COMPANY,
10
          Defendant.
11   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
12
13
14
                      ZOOM DEPOSITION OF
15
                       CONNOR S. KIDD
16
17
                       June 30, 2023
18
                         12:02 p.m.
19
20
                    Overland Park, Kansas
21
22
23   Reported By:
24   McKalie M. Bellew
25   Certified Stenographic Reporter #23009076
```

Page 2

```
 1   APPEARANCES OF COUNSEL
 2
 3     For PLAINTIFF:
 4         SNODGRASS LAW LLC
           BY:  T. JOSEPH SNODGRASS
 5         100 South Fifth Street, Suite 800
           Minneapolis, Minnesota 55402
 6         612.448.2600.
           jsnodgrass@snodgrass-law.com
 7
 8     For DEFENDANT:
 9         ROBINSON & COLE LLP
           WYSTAN M. ACKERMAN
10         280 Trumbull Street
           Hartford, Conneticut 06103
11         860.685.8773.
           wackerman@rc.com
12
13
14   Also appearing:
15     Olta Shkembi (Summer Associate)
16     Richard Smith (in-house counsel for Travelers)
17
```

Page 3

```
 1                    I N D E X
 2
 3   WITNESS: CONNOR S. KIDD
 4
 5   EXAMINATION                                  PAGE
 6
 7   BY Mr. Snodgrass...............................5
 8
 9                    *    *    *
```

Page 4

```
 1                  INDEX TO EXHIBITS
 2
 3   EXHIBIT                                      MARKED
 4
 5   Exhibit No. 1  Connor Kidd LinkedIn............ 7
     Exhibit No. 2  List of Travelers entities...... 11
 6   Exhibit No. 3  5/6/20 Declaration of Robert F.
                    Gillis, Jr...................... 26
 7   Exhibit No. 4  12/11/18 ACV Cover Letter....... 31
     Exhibit No. 5  Xactimate depreciation option
 8                  settings........................ 41
     Exhibit No. 6  Printout from ESX file (with
 9                  NMD)............................ 51
     Exhibit No. 7  Printout from ESX file (without
10                  NMD)............................ 55
     Exhibit No. 8  MO Stat. 375.1007............... 66
11   Exhibit No. 9  MO 20 CSR 100-1.040............. 74
     Exhibit No. 10 Certified Policy................ 79
12   Exhibit No. 11 Connor Kidd declaration......... 57
     Exhibit No. 12 Damages Summary................. 58
```

888-893-3767 Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
www.lexitaslegal.com
Case 2:23-cv-04079-BCW Document 26-1 Filed 08/01/23 Page 1 of 18


Page 5

1  OVERLAND PARK, KANSAS;
2  JUNE 30, 2023; 12:02 P.M.
3
4  CONNOR S. KIDD,
5  called as a witness herein, having been first duly sworn
6  by the Certified Reporter to speak the whole truth and
7  nothing but the truth, was examined and testified as
8  follows:
9
10  EXAMINATION
11  BY MR. SNODGRASS:
12  Q. Mr. Kidd, can I get your full name and
13  residential address, please?
14  A. Yeah. It's Connor Sterling Kidd. K-i-d-d. The
15  first name is C-o-n-n-o-r.
16  Address is 15718 West 139th Street in Olathe,
17  O-l-a-t-h-e, Kansas, 66062.
18  Q. Okay. And do you have a LinkedIn page, Mr. Kidd?
19  A. I do, yes.
20  Q. And does this look to be your LinkedIn page?
21  A. Yep. As far as I can tell that's it.
22  Q. Okay. And did you yourself create this?
23  A. I did.
24  Q. And is this up to date?
25  A. Yeah, I couldn't say. You know I haven't -- I

Page 6

1  don't think I've updated this in quite a while.
2  Q. Okay. Let's take it one step at a time.
3  Can you give me your current employer or
4  employers and your job title or job titles?
5  A. Yes. I work for Travelers Insurance, and my job
6  title is Technical Specialist.
7  Q. And do you know your exact current corporate
8  employer?
9  A. So, you know, commonly referred to as Travelers
10  Insurance. Are you asking what would be on a paycheck?
11  Q. Sure. If you -- more importantly, do you even
12  know the name of the company you work for? The precise
13  Travelers entity you work for?
14  A. Travelers Indemnity, I believe.
15  Q. Can you give me the full name of your employer,
16  as you know it?
17  A. As I know it, it's Travelers Indemnity.
18  Q. Travelers Indemnity Company? Travelers Indemnity
19  Corporation?
20  A. You know, maybe I don't have that exact name for
21  you. I would -- I don't want to give you the wrong
22  answer.
23  Q. Okay. Have you always worked for this quote,
24  unquote Travelers Indemnity Entity during your time
25  period with the Travelers group?

Page 7

1  A. Yes.
2  Q. Okay. When did you start -- first start working
3  for the Travelers group?
4  A. It would have been 2015.
5  Q. Okay. Can you give me your educational
6  background, please?
7  A. Yes. I graduated with a bachelor's degree in
8  finance from Kansas State University in 2012.
9  Q. Anything else?
10  A. Not after that, no.
11  Q. Okay. On your LinkedIn page it says that you
12  still work for something called Pacesetter Claims
13  Service; is that accurate?
14  A. No, it is not.
15  Q. When did you start working for Pacesetter Claims
16  Service?
17  A. That would have been probably December of 2012.
18  I worked very briefly for that company. I was deployed
19  on one storm. And that was about a three-month
20  deployment which started in October, I believe, ended in
21  December.
22  Q. Okay. Was that your first -- and, for the
23  record, I'll mark as Exhibit 1 your LinkedIn page.
24  (Deposition Exhibit No. 1 was marked for
25  identification.)

Page 8

1  BY MR. SNODGRASS:
2  Q. Was that your first job with an insurance agency?
3  A. Yes, it was.
4  Q. Okay. And when you were working for Pacesetter,
5  were you using Xactimate?
6  A. Yes, I was.
7  Q. And were you working as a catastrophe adjuster?
8  A. Yes, I was.
9  Q. And then you left the insurance industry for a
10  while?
11  A. I did.
12  Q. And then you came back and you started working
13  for Travelers in approximately April of 2015?
14  A. Correct.
15  Q. And can you tell me what your current job duties
16  are as a technical specialist?
17  A. Yeah. So I handle -- so handling first-party,
18  you know, personal insurance lines claims, ag claims,
19  business claims, anywhere from a moderate to severe
20  complexity ranging from, you know, it could be a partial
21  denial because I do handle fire claims that only go to
22  my position.
23  So, anywhere from claims generally from $50,000
24  up to half a million dollars in total exposure.
25  Q. You said 50K to 500K?

888-893-3767 Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116B
www.lexitaslegal.com
Case 2:23-cv-04079-BCW Document 26-1 Filed 08/01/23 Page 2 of 18


Page 9
1  A. Yeah. Give or take.
2  Q. Okay. So let's break this down a little bit.
3     Did you say personal lines and commercial lines?
4  A. Personal lines, commercial lines, ag --
5  agribusiness. Agricultural lines.
6  Q. And when you say first-party insurance claims, do
7  you focus primarily on structural losses? Contents?
8  Business interruption? All of it? None of it? Can you
9  describe what niches in the coverage world, if any, you
10 are in?
11 A. Yeah, so, first-party structural damage
12 primarily. I do handle claims involving contents,
13 additional living expenses on the personal side.
14    If there is a claim that's identified as a claim
15 where there's going to be, you know, very, I guess,
16 increased exposure when it comes to personal property
17 specifically, we do have a contents coordinator that I
18 can refer.
19    Same with, I guess, this is going over to
20 commercial lines, but if there is going to be a
21 complicated or a complex loss for business income
22 interruption, we do refer those to our claim accounting
23 services.
24    If it's a -- you know, a relatively
25 straightforward simple business income loss, then I can

Page 10
1  calculate that and handle that.
2  Q. Okay. What's your breakdown between personal,
3  commercial and agribusiness?
4  A. Are you talking about, you know, percentage of my
5  inventory?
6  Q. Correct.
7  A. I would say 70 percent personal lines, 25 percent
8  -- so, yeah. 70 percent personal, 25 percent
9  commercial, 5 percent ag.
10 Q. And what's your breakdown between structural
11 damage versus all of it?
12 A. Well, there is structural damage on 100 percent
13 of the claims that I handle. There's personal property
14 damage on probably 90 percent of the claims I handle.
15 Of that 90 percent I may handle 20 percent of those
16 personal property claims; meaning, you know, that the
17 remaining 70 percent, we refer out to a contents
18 coordinator.
19 Q. Got it.
20    Can you tell me for which Travelers entities you
21 handle claims on behalf of?
22 A. You know, are you speaking, you know, in regards
23 to the different -- the underwriting companies?
24 Q. Right. Let's get a common vernacular if we can.
25 A. Okay.

Page 11
1  Q. When you say "underwriting companies," I'm
2  assuming you're referring to different affiliated
3  Travelers entities; correct?
4  A. Correct. Yeah.
5     MR. ACKERMAN: Objection to form.
6  BY MR. SNODGRASS:
7  Q. You can go ahead and answer.
8     From time to time, Mr. Kidd, your attorney's
9  going to make an objection and once he's completed, you
10 can go ahead and answer.
11 A. Okay. Do you mind repeating your question? I
12 apologize.
13 Q. Sure.
14    By underwriting companies, you mean different
15 Travelers entities; correct?
16 A. Correct.
17 Q. Okay. And can you identify for my -- maybe this
18 will help and I'll mark this as Deposition Exhibit
19 Number 2.
20    (Deposition Exhibit No. 2 was marked for
21    identification.)
22 BY MR. SNODGRASS:
23 Q. Can you see this?
24 A. I can, yes.
25    So a couple of these came to mind. Would you

Page 12
1  like me to identify the ones that I work with?
2  Q. Sure.
3  A. Okay. So I've seen the Standard Fire Insurance
4  Company.
5  Q. Okay.
6  A. The Travelers Personal Insurance Company.
7     I recognize The Charter Oak Fire Insurance
8  Company.
9     Do you mind scrolling down a little bit? There
10 you go.
11    The Travelers Indemnity Company of America.
12    The Travelers Home and Marine Insurance Company.
13    Yeah, I think I've identified the ones that I
14 commonly work with.
15 Q. Okay. And did you say -- did you say one of them
16 was Travelers Home and Marine?
17 A. Yes.
18 Q. Okay. And just so we have a common understanding
19 then, when you were listing those underwriting
20 companies, those were the underwriting companies for
21 which you can recall handling one or more first-party
22 claims on behalf of.
23    Is that what you were doing for me?
24 A. Correct, yeah. To -- just kind of going off of
25 memory.

888-893-3767                Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116B                LEXITAS
www.lexitaslegal.com
Case 2:23-cv-04079-BCW   Document 26-1   Filed 08/01/23   Page 3 of 18

Page 17

1  A. That is correct.
2  Q. And you were an OCR between 2015 and becoming a
3  technical specialist?
4  A. I was an OCR from 2017 to 2021, so a little over
5  two years -- or excuse me -- a little over four years.
6  Q. Okay. So you were an OCR when you handled the
7  claim that brings us here today?
8  A. That is correct.
9  Q. Okay. Before you were an OCR, what were you?
10  A. I was working in the auto claim department. I
11  was handling low-severity medical claims, low-severity
12  bodily injury claims.
13  Q. Okay. So I don't really care too much about that
14  if -- was all of your time prior to 2017 and becoming an
15  OCR, was that all nonstructural work on behalf of
16  Travelers in some fashion?
17       MR. ACKERMAN: Objection to form.
18       THE WITNESS: Well, with the exception of my
19  job in 2012 when I was doing structural with Pacesetter.
20  BY MR. SNODGRASS:
21  Q. Correct. But within Travelers?
22  A. Correct. Within Travelers prior to 2017 there
23  was nothing structural-related.
24  Q. Okay. So from 2017 to the present you've been
25  handling structural damage claims. I think you

Page 18

1  mentioned 100 percent of the time your claims involving
2  -- involve structural damage.
3       Can you tell me the two different software
4  platforms that you have been using for handling
5  structural claims? And, particularly, what I'm looking
6  for is what's the name of the claims management software
7  and what's the name of the claims estimating software
8  you've been using.
9       MR. ACKERMAN: Objection.
10      THE WITNESS: So the claims estimating
11  software, the software from which we write our
12  estimates, is Xactimate. And then were you speaking
13  relative to the, you know, the Travelers software that
14  we use for file documentation and whatnot?
15  BY MR. SNODGRASS:
16  Q. Correct.
17  A. Okay. So that's commonly referred to as claim
18  platform.
19  Q. Did you say claim platform?
20  A. Claim platform, correct.
21  Q. Okay. And I take it Travelers is paperless; in
22  other words, there's no such thing as a paper claim file
23  that you review and document with a pen and a pencil.
24  All of your work is documented electronically in the
25  claim platform or Xactimate software; is that fair?

Page 19

1  A. You know, I can't speak for -- for every single
2  claim, but, yes, everything is documented
3  electronically.
4  Q. Do you have paper claim files?
5  A. You know, specifically to me I don't think I've
6  ever operated a file by using a paper claim file.
7  Q. Okay. Has that -- those two software choices
8  changed during the course of your work handling
9  structural damage claims? In other words, you always
10  use claim platform as the claims management software;
11  you always use Xactimate as the claim estimating
12  software.
13  A. That is correct.
14  Q. Okay. And when did you first -- well, when you
15  started in 2017 with Travelers, had you already used
16  Xactimate software?
17  A. I had.
18  Q. And when you were at Pacesetter, and I know it
19  was only a three-month window, were you actually trained
20  in how to use Xactimate?
21  A. I was.
22  Q. And do you recall how long your training was with
23  Pacesetter?
24  A. I want to say it was four weeks. I believe --
25  yeah, I believe there were four different one-week

Page 20

1  sessions.
2  Q. And was that all internal or was some of that
3  with Xactimate -- with Xactware Solutions directly?
4  A. That would have all been internal through
5  Pacesetter.
6  Q. Okay. When you left auto and started working
7  structural claims for Travelers, did you get Xactimate
8  training again?
9  A. Yes.
10  Q. And can you describe all of the training you've
11  had with Xactimate software while at Travelers?
12  A. Sure.
13      So it was, you know, a mixture of training via
14  coursework, you know self-paced, you know, review these
15  documents. There were Zoom calls or teams calls,
16  whatever we were using back in 2017, and there was also
17  in-person training at our claim training site out of
18  state.
19  Q. How long do you think that those various training
20  sessions in the aggregate took?
21  A. In the aggregate, okay.
22      So, I took at least -- that's hard to answer
23  'cause there's constantly ongoing training. I can
24  recall at least three visits to our claim training
25  center outside of Hartford, Connecticut. There would

888-893-3767                Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116B                LEXITAS
www.lexitaslegal.com
Case 2:23-cv-04079-BCW   Document 26-1   Filed 08/01/23   Page 4 of 18

Page 33

1 estimating software platform you use is Xactimate, but
2 for structural repairs, is there any other methodology
3 that you've been taught to use other than Xactimate to
4 calculate actual cash value?
5         MR. ACKERMAN:  Objection to form.
6         THE WITNESS:  Can you repeat the question,
7 please?
8 BY MR. SNODGRASS:
9   Q.  Sure.
10         When you calculate actual cash value, you usually
11 -- Well, let me ask you this.
12         In this case you calculated actual cash value as
13 the full cost of repair or replacement less depreciation
14 to get actual cash value; right?
15   A.  Correct.
16   Q.  Okay.  Let's just refer to this as the RCLD,
17 Replacement Cost Less Depreciation methodology.  Okay?
18   A.  Okay.
19   Q.  Okay.  First off, how do you, yourself, define
20 actual cash value?
21   A.  What is the value of the roof today?  I would say
22 actual cash value is, you know, kind of interchangeable
23 with fair market value.
24   Q.  Okay.  But here you calculated actual cash value
25 by using repair or replacement cost less depreciation;

Page 34

1 correct?
2   A.  Yes.  The replacement, the RCB less depreciation.
3 That's how we find our actual cash value.
4   Q.  Okay.  Do you always use Xactimate to calculate
5 actual cash value for structural loss?
6   A.  In my position, typically, it may be handled
7 differently at other levels.  We use Xactimate to
8 estimate for damages, which, in turn, gives us the
9 placement cost value.  Again, we generally use Xactimate
10 to enter depreciation, which then, in turn, gives us the
11 actual cash value.
12   Q.  Okay.  And that's what I was trying to get at.
13         When have you not used Xactimate to calculate
14 depreciation, if any, I don't mean to put words in your
15 mouth.
16   A.  To calculate depreciation.  For structural, you
17 know, I can think of maybe to a time where we've gone
18 away from --  Well, systematically we use Xactimate.
19 However, there have been times where, say, maybe
20 Xactimate has a line item, and the life or the age
21 expectancy of that line item, you know, after conferring
22 with experts and whatnot, we maybe don't agree with that
23 age expectancy, which would then, you know, lower the
24 ACV payment.  There have been times where we've changed
25 it to a depreciation, but, you know, systematically the

Page 35

1 software that we use is Xactimate.
2   Q.  Okay.  So sometimes it sounds like you may
3 manually enter depreciation on a particular Xactimate
4 line item if you disagree with it; is that fair?
5   A.  Again, just speaking, you know, from my own claim
6 history, claim volume, it's very rare that that happens,
7 but, yes.
8   Q.  Okay.  Do you ever recall an incident where that
9 did happen by -- I mean, can you give me a claim name or
10 a claim description of that ever happening?
11   A.  On structural, no.  These are specialty items.
12 We've done them for personal property before, but when
13 it comes to a structure, I don't think I've ever applied
14 that.
15   Q.  Okay.  So for a structure you've always -- for a
16 structural claim you've always used Xactimate to
17 calculate depreciation?
18   A.  To the best of my knowledge.
19   Q.  Okay.  And I'm not sure what level of expertise
20 you have in Xactimate, but it's true, is it not, that
21 the only way Xactimate can calculate actual cash value
22 is to do the full cost of replacement less depreciation;
23 correct?
24         MR. ACKERMAN:  Objection to form.
25 BY MR. SNODGRASS:

Page 36

1   Q.  And this is always exclusively for structural.
2   A.  Can you ask the question again?
3   Q.  Sure.
4         This is just -- I'm asking about Xactimate
5 software.  To my knowledge, the only way Xactimate can
6 calculate actual cash value is to determine the full
7 cost of repair replacement and then subtract
8 depreciation.  That's the only way Xactimate can
9 calculate actual cash value.
10         Do you agree or do you disagree?
11         MR. ACKERMAN:  Objection to form.
12         THE WITNESS:  I'm -- I don't think I could
13 agree or disagree.  It is, you know, the method I'm --
14 that I'm familiar with, but to say definitively that
15 that's the only way, I -- it would be speculation.
16 BY MR. SNODGRASS:
17   Q.  Well, have you ever used Xactimate to calculate
18 actual cash value in any other way other than RCLD?
19   A.  From -- from my experience, my claim volume, I
20 have not.
21   Q.  Okay.
22   A.  That's not to say it couldn't be done.  That's
23 just my experience with the software.
24   Q.  Okay.  And for the Ledford claim you conferred --
25 confirmed coverage existed; correct?



Page 37

1    A.  Yes, I would have conducted some sort of coverage
2  analysis.
3    Q.  And does your letter refer to any denial of the
4  claim?
5    A.  I don't believe so, no.
6    Q.  Do you recall denying the claim in part at all?
7    A.  I do not.
8    Q.  Okay.  And how did you confirm that coverage was
9  existed -- that coverage existed for the Ledfords?
10   A.  So we look at a number of things.
11       We look at the date of loss.
12       We confirm their, you know, storm activity on the
13  date of loss.
14       We confirm that the date of loss was within the
15  policy period.
16       And, again, it's claim by claim, but we, you
17  know, we read through the policy, determine what perils
18  are covered and what aren't.
19       We look at the deductible amount, all that stuff.
20  Yeah, but it's just a thorough review of the policy and
21  the declarations page.
22   Q.  Okay.  Do you -- or does the system automatically
23  do this, do you -- do you confirm whether premiums were
24  paid?
25   A.  I -- you know, as the adjuster, as the claim

Page 38

1  professional, I do not.
2    Q.  Okay.  How do you know that you're paying on a
3  claim where the policy has been paid up?  Does somebody
4  else do that?
5    A.  Yeah.  I mean, someone would have to do that.
6  Again, it would be speculation if I were to try and
7  guess who keeps track of that.
8    Q.  Okay.
9        MR. SNODGRASS:  I got a little emergency
10  here.  I got to take a call.  Can we take a break for
11  five minutes, guys?
12       MR. ACKERMAN:  Yep.  That's fine.
13       MR. SNODGRASS:  Okay.  Great.  Thanks.
14       (A break was taken off the record from 12:52
15       p.m. to 12:56 p.m.)
16
17  BY MR. SNODGRASS:
18   Q.  Mr. Kidd, do you as part --
19       Oh, you're on mute, Mr. Kidd.
20       Mr. Kidd, do you yourself determine whether or
21  not there is compliance with any policy conditions when
22  you handle structural claim?
23   A.  For the most part, yes.
24   Q.  Okay.  And Exhibit 4 --
25       And did you raise with the Ledfords any failure

Page 39

1  to comply with any policy conditions?
2    A.  Not that I can recall.
3    Q.  Do you recall denying a claim in whole or in part
4  based on the failure to comply with any policy
5  conditions?
6    A.  I do not.
7    Q.  The letter that you sent, the template that has
8  the RCLD methodology, was that how you were trained to
9  determine actual cash value for structural claims by
10  somebody at Travelers?
11       MR. ACKERMAN:  Objection to form.
12       THE WITNESS:  Was the letter how we were
13  trained to get that ACV?
14  BY MR. SNODGRASS:
15   Q.  No.  The letter lays out the replacement cost
16  less depreciation methodology to calculate ACV.  I'm now
17  asking you, is that how you were trained by Travelers to
18  calculate ACV?
19   A.  Yes, it was.
20   Q.  And when were you first trained by Travelers to
21  calculate actual cash value through the replacement cost
22  less depreciation methodology?
23   A.  2017.
24   Q.  And during the entire time you've worked on
25  structural claims, has Travelers ever taught you to use

Page 40

1  a different methodology to calculate actual cash value
2  for structural damage claims?
3    A.  Not that I can recall.
4    Q.  And, in particular, your testimony was relevant
5  during the entire time you worked for Travelers handling
6  claims in the state of Missouri?
7        MR. ACKERMAN:  Objection to form.
8        THE WITNESS:  Sorry.  Repeat the question.
9   BY MR. SNODGRASS:
10   Q.  Sure.
11       You always used the replacement cost less
12  depreciation methodology to calculate actual cash value
13  for all of your Missouri claims; correct?
14   A.  Correct.  When -- yeah, calculating that --
15  calculating that ACV, yes.
16   Q.  And you always used replacement cost less
17  depreciation to calculate actual cash value for
18  structural claims in the state of Missouri, regardless
19  of the Travelers policy form issued by the various
20  underwriting companies; correct?
21   A.  If I'm understanding the question correctly, you
22  know, regardless of the policy form, that would be no.
23  We look at every policy form and treat each claim on a
24  claim-by-claim basis.
25   Q.  Move to strike as nonresponsive.

888-893-3767    Lexitas operates in all 50 states and is licensed where required | Nevada Registration #118F
www.lexitaslegal.com
Case 2:23-cv-04079-BCW   Document 26-1   Filed 08/01/23   Page 6 of 18


Page 41
1    That wasn't my question.
2    My question was, regardless of the policy form,
3 do you always use replacement cost less depreciation to
4 calculate actual cash value or structural claims in
5 Missouri?
6    A. If that policy form contains language that states
7 that we have for pay ACV, yes, we are using that RCLD
8 methodology to find that ACV.
9    Q. Thank you.
10    Okay. Showing you what we'll mark as Deposition
11 Exhibit No. 5.
12       (Deposition Exhibit No. 5 was marked for
13       identification.)
14 BY MR. SNODGRASS:
15    Q. And I'll represent to you that this is just a
16 blank document with just this Xactimate screenshot on
17 this. But can you identify what we're looking at based
18 on your own experience?
19    A. Depreciation options.
20    Q. And are you familiar with these depreciation
21 option settings?
22    A. Only recently.
23    Q. When did you first become -- first start to have
24 information or knowledge about these particular
25 depreciation option settings reflected in Exhibit 5?

Page 42
1    A. You know, I would say probably just, you know, in
2 review in preparation of this claim.
3    Q. When you say "in review of preparation of this
4 claim," do you mean when you were handling the claim or
5 in preparation for your deposition today?
6    A. In preparation of the deposition.
7    Q. So prior to this time you did not have any
8 familiarity with these particular depreciation option
9 settings within Xactimate?
10    A. They were not settings that, you know, I was
11 actively changing within Xactimate.
12    Q. And I want to get to that testimony.
13    So, as I understand it from different carriers,
14 these depreciation option settings are usually set in
15 one of two fashions.
16    One, they are either grayed-out; or, two, they
17 are set when you enter your loss location.
18    So, first off, I want to ask you. Do you know
19 what I mean when I say "grayed-out"?
20    MR. ACKERMAN: Objection to form.
21    THE WITNESS: Are you speaking, you know,
22 within the software, or --
23 BY MR. SNODGRASS:
24    Q. Yeah.
25    A. -- on an estimate?

Page 43
1    Q. Correct. No. I'm talking about when you're in
2 the software and a certain function of the software is
3 grayed-out. Do you know what I mean by that?
4    A. I believe so.
5    Q. Okay. And just so we're -- and I'm sure we have
6 a common vernacular. What do you mean when you think of
7 software, when you're using it having a function that is
8 grayed-out?
9    A. You're unable to make changes.
10    Q. Okay. Okay.
11    And then, the other circumstance that I've seen
12 carriers have this depreciation option settings get set
13 is default based on the loss location. In other words,
14 when you create an Xactimate estimate, do you enter a
15 loss location or a price list based on a geography?
16    MR. ACKERMAN: Objection to form.
17    THE WITNESS: So, I specifically do not
18 enter a loss location. That is done, kind of,
19 system-generated.
20 BY MR. SNODGRASS:
21    Q. Okay.
22    A. I do, however, select the price list. That's
23 correct.
24    Q. Okay. Have you ever navigated when you've
25 handled a claim to this screen of depreciation option

Page 44
1 settings?
2    A. It's possible.
3    Q. Okay. Do you ever recall changing any of these
4 depreciation option settings for any particular claim?
5    A. Not that I can recall.
6    Q. Do you know if your depreciation option settings,
7 when you use the Xactimate version Travelers provides to
8 you, do you know whether these option settings are
9 grayed-out or prepopulated?
10    A. Yeah, I could not tell you.
11    Q. Do you know what these various depreciation
12 option settings do?
13    A. I do, yes.
14    Q. Okay. Can you describe for me as based on what
15 -- well...
16    Where does your understanding of what these
17 depreciation option settings do? Where does that come
18 from?
19    A. Where does my understanding come from?
20    Q. Correct.
21    A. Just kind of -- kind of looking at them. You
22 know, not to be rude, but just common sense. If we have
23 these boxes checked, that means we're depreciating
24 material, nonmaterial removal, OMP and sales tax.
25    Q. Okay.

888-893-3767                   Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F                   www.lexitaslegal.com

Case 2:23-cv-04079-BCW   Document 26-1   Filed 08/01/23   Page 7 of 18

Page 45

1  A. Yeah.
2  Q. So would you understand generally that depreciate
3  nonmaterial would be the depreciation of labor?
4  A. I think it would be labor, among other things.
5  Q. And what other things?
6  A. Could be specialty equipment. Use of equipment.
7  Q. Contractors' equipment used in the repairs?
8  A. Correct.
9  Q. Okay. What else could be -- could it be?
10  A. That's the big one that I see.
11  Q. Okay. What about depreciate removal? What do
12  you think depreciate removal does?
13  A. So the -- essentially depreciating the demo or
14  removing a part of the structure.
15  Q. And would that be labor?
16  A. I -- I believe so. Yes.
17  Q. Okay. Depreciate overhead and profit. Let's
18  first talk about overhead and profit.
19      Do you have certain stand- -- do you have the
20  ability under Xactimate in Travelers' guidelines to
21  award overhead and profit on a given claim?
22  A. I do.
23      MR. ACKERMAN: Objection to form.
24  BY MR. SNODGRASS:
25  Q. And what standards do you apply in determining

Page 46

1  whether or not to award overhead and profit on a claim?
2      MR. ACKERMAN: Objection to form.
3      THE WITNESS: So, it's claim-by-claim. When
4  the complexity and coordination calls for it.
5  BY MR. SNODGRASS:
6  Q. You said "complexity," and what was the second
7  one that you used?
8  A. The, you know, general contractor coordination.
9  Q. And so can you give me an example of a claim
10  where you would award overhead and a profit and a claim
11  where you would not award overhead and profit?
12      MR. ACKERMAN: Objection to form.
13      THE WITNESS: Sure.
14      So, you know, in my capacity as a TS, I
15  handle fire losses. Fire losses sometimes can be a
16  total loss. We're dealing with roof, framing, carpet,
17  windows, doors, drywall, paint, insulation. There's a
18  general contractor handling those. There's going to be
19  a lot of different trades, a lot of complexity and
20  coordination.
21      A claim for wind damage, we've got a roofer
22  coming out there. We would not apply overhead and
23  profit to that claim, generally speaking.
24  BY MR. SNODGRASS:
25  Q. So, as I understand your testimony, overhead and

Page 47

1  profit then is awarded by you to account for the general
2  contractor's time and expense in coordinating multiple
3  trades on the job site.
4      Is that a fair recitation of your standards?
5      MR. ACKERMAN: Objection to form.
6      THE WITNESS: Yeah, I would say, you know,
7  part of it.
8  BY MR. SNODGRASS:
9  Q. What's the other part of it?
10  A. I mean, even if there was, say, one or two
11  trades, but maybe it's commercial structure, and there
12  are other things to consider.
13      Again, it's claim-by-claim, right? So, if we've
14  got a commercial structure that's staying -- that needs
15  to stay open, there could be, you know, additional
16  workers. It's not just coordination but also complexity
17  of the claim. Maybe it's a large area and it will take,
18  you know, more time than a small loss.
19  Q. And that's what I guess I'm getting at.
20      So the more time the contractor has to spend to
21  coordinate the complexity or the multiple trades, that's
22  when you're more likely to award overhead and profit;
23  correct?
24  A. Yes, I would agree with that.
25  Q. Okay. You did not award overhead and profit on

Page 48

1  the Ledford claim; is that correct?
2      MR. ACKERMAN: Objection to form.
3      THE WITNESS: I don't believe so, no.
4  BY MR. SNODGRASS:
5  Q. Okay. Do you know -- or has Travelers ever
6  provided to you training on what depreciation option
7  settings to use in the states in which you operate?
8  A. Me, specifically -- so training on specifically
9  how to make changes in Xactimate?
10  Q. Yes.
11  A. Me, specifically, you know, not that I can
12  recall.
13  Q. Okay. As far as you know, do you handle claims
14  differently dependent upon how those depreciation option
15  settings are used?
16  A. Do I handle claims differently dependent on how
17  the depreciation options are used?
18  Q. Correct. In other words, the depreciation option
19  settings we just looked at, my recollection from your
20  testimony is you don't recall ever changing those
21  settings. And so my question to you is, would those
22  settings, regardless of who set them and what they were
23  set at, are they going to change the way you handle a
24  structural damage property claim?
25      MR. ACKERMAN: Objection to form.

888-893-3767  Lexitas operates in all 50 states and is licensed where required Nevada Registration #116B
www.lexitaslegal.com
Case 2:23-cv-04079-BCW  Document 26-1  Filed 06/01/23  Page 8 of 18

Page 49

1  THE WITNESS: Those settings specifically,
2  no. No. We handle claims on a claim-by-claim basis.
3  But I can't say that the way I handle it would be driven
4  by any settings in Xactimate.
5  BY MR. SNODGRASS:
6  Q. Well, in particular, if depreciate nonmaterial is
7  checked or not checked, is that going to change
8  anything -- any standard, any methodology that you use
9  to handle a claim?
10  A. No, I mean -- not -- nothing that I can think of.
11  I can't think of any -- No.
12  Q. Okay. As far as you are aware -- Well, let me
13  ask you this.
14  Before your deposition did you take a look at the
15  claim file for the Ledfords?
16  A. I did.
17  Q. And what portions of the claim file did you look
18  at?
19  A. I looked through the notes.
20  I looked at the claim summary screen.
21  I looked at the financials. So, I mean, the
22  payments issued.
23  I reviewed the invoice received.
24  Letters sent to Mr. and Mrs. Ledford.
25  And the estimate.

Page 50

1  Q. Okay. When you reviewed the file, did you find
2  anything that was atypical about this roof/hail loss?
3  A. That was atypical?
4  Q. Yes.
5  A. No.
6  Q. Okay. When you looked at the claim file, did you
7  look at it electronically or did you look at it in PDF
8  format?
9  A. You mean recently while reviewing or originally?
10  Q. Recently while reviewing for the deposition.
11  A. So, I was able to view it electrically through
12  our claim platform. And we also reviewed -- I believe
13  we reviewed PDFs as well.
14  Q. Okay. When you prepared to -- for the deposition
15  in this case, did you review the claim file in Xactimate
16  at all?
17  MR. ACKERMAN: Objection to form.
18  THE WITNESS: I don't believe so. I know
19  I've reviewed the Xactimate estimate. I think I may
20  have looked through Xactimate, but maybe not specific to
21  this claim. Just to kind of review the functions.
22  BY MR. SNODGRASS:
23  Q. Okay. Did you access the .ESX file for this
24  claim prior to your deposition today?
25  A. I did not.

Page 51

1  Q. Okay.
2  MR. SNODGRASS: McKalie, we're on what number
3  now?
4  THE COURT REPORTER: Next will be 6.
5  MR. SNODGRASS: Okay.
6  BY MR. SNODGRASS:
7  Q. I'm showing you what I'm marking as Deposition
8  Exhibit No. 6.
9  (Deposition Exhibit No. 6 was marked for
10  identification.)
11  BY MR. SNODGRASS:
12  Q. And I'll represent to you this is a print off
13  that we did of the .ESX file for the Ledfords that was
14  produced to us in this case.
15  First off, does this summary and those numbers,
16  do those look like that is the same as the ACV cover
17  letter payment description that was provided to you
18  earlier as Deposition Exhibit No. 4?
19  A. I believe so. I guess I would have to see them
20  side by side to confirm they are the exact numbers but
21  that does look --
22  Q. And I can show you them right now.
23  So you have a full cost of repair in your cover
24  letter of $12,540.99. And in the summary that's the
25  same number.

Page 52

1  A. Yep.
2  Q. And then we go to the payment. It's $6,840.07.
3  And that's what we have as the net claim.
4  You see that?
5  A. I do, yes.
6  Q. Okay. And so that was the actual amount of the
7  ACV payment that Xactimate issued to the Ledfords on
8  December 11th, 2018; correct?
9  MR. ACKERMAN: Objection to form.
10  THE WITNESS: I believe so, yes.
11  BY MR. SNODGRASS:
12  Q. Okay. And when we printed this off, there's a
13  option in the print settings for Xactimate to have the
14  depreciation option settings appear on the first page.
15  Do you see those there?
16  A. I do.
17  Q. Okay. And you said that you first became aware
18  of this depreciation option settings as you were
19  preparing for your deposition. Can you give me a little
20  bit more refined timeframe? Was that in June of 2023?
21  A. Yes. I believe so, yeah.
22  Q. Okay. And you'll see that this has deprecation
23  set for nonmaterial and overhead and profit but not for
24  removal labor.
25  Do you see that?



**Page 53**

1  A. I do, yes.
2  Q. Okay. Was -- do you know who is the person at
3  Travelers that was responsible for setting up Xactimate
4  to have these depreciation option settings as they were
5  set when you handled this claim in December of 2018?
6  A. I do not know.
7  Q. I take it that wasn't you?
8  A. No.
9  Q. And had -- up until this point in time in June of
10 2023, had anyone ever given you any training on these
11 depreciation option settings while you were working at
12 Travelers?
13 A. Again, specifically on how to change them in
14 Xactimate?
15 Q. How to change them, when you might turn one on
16 versus turning one off. Anything.
17 A. Yeah, specifically, in Xactimate, I don't recall
18 training.
19 Q. Okay. But you, I believe, based on your own
20 common sense, would believe that labor was depreciated
21 in this -- in your December 11th, 2018, estimate because
22 the depreciate nonmaterial was checked on; correct?
23 A. Yes. And -- I don't really recall seeing that
24 portion on the front page of the estimate. You know, it
25 could be I haven't really handled claims like this in a

**Page 54**

1  while and I don't believe it's on my estimate -- current
2  estimates. But, yes, I was aware that we were
3  depreciating nonmaterial.
4  Q. Okay. Have you ever rerun the estimate without
5  depreciating nonmaterial?
6  A. Not that I recall.
7  Q. Okay. And so as part of your review, you never
8  reviewed the estimate to determine how much more the
9  policyholder would have received if you had not
10 depreciated nonmaterial?
11     MR. ACKERMAN: Objection to form.
12     THE WITNESS: So, again, I was -- I did not
13 make any changes to the .ESX. Thinking back to my
14 review, I think we -- honestly, I can't recall if we did
15 that or not.
16 BY MR. SNODGRASS:
17 Q. Okay. Showing what I'm marking as Deposition
18 Exhibit No. --
19     MR. SNODGRASS: What are we on, McKalie?
20     THE COURT REPORTER: 7.
21 BY MR. SNODGRASS:
22 Q. Showing what I'm marking as Deposition Exhibit
23 No. 7.
24     (Deposition Exhibit No. 7 was marked for
25     identification.)

**Page 55**

1  BY MR. SNODGRASS:
2  Q. And I'll represent to you that this is your .ESX
3  file, but you'll notice now that nonmaterial
4  depreciation and OMP is turned off.
5     Do you see that?
6  A. I do.
7  Q. Okay. And do you see that the net ACV payment
8  goes up to $9,048.02?
9  A. I do.
10 Q. Okay. Were you aware that before the
11 depreciation of labor in your first estimate that the
12 policyholder would have received an additional
13 $2,207.95?
14 A. That's right. That's the difference between --
15     MR. ACKERMAN: Objection to form.
16 BY MR. SNODGRASS:
17 Q. Go ahead.
18 A. You're giving me the difference between the ACV
19 payments?
20 Q. Correct.
21 A. Okay. Yep, I understand.
22 Q. Okay. And then the question was, were you aware
23 that your ACV payment would have resulted in an
24 additional $2,207.95?
25 A. No.

**Page 56**

1  Q. Okay. Did you ever pay the policyholders an
2  amount equal to or greater than $2,207.95 on this claim?
3  A. Did I ever pay that exact amount or more than
4  that?
5  Q. Correct.
6  A. My original ACV payment, yes.
7  Q. Was that your answer? You did pay more than
8  that? Than the 9- -- the question was, did you pay more
9  than $9,048.02?
10 A. Oh, I apologize. I thought you were asking if we
11 paid more than the $2,000.
12 Q. Yeah. Let me just be real clear.
13     We're looking at Exhibit No. 7. This is the .ESX
14 file now without nonmaterial depreciation. The net
15 claim, and is your estimate, all we did is toggle off
16 nonmaterial OMP -- the net claim would have went up to
17 $9,048.02.
18     Do you dispute that?
19     MR. ACKERMAN: Objection to form.
20     THE WITNESS: Yeah. If this is an estimate
21 with labor not depreciated, then I agree. That would be
22 this ACV, yes.
23 BY MR. SNODGRASS:
24 Q. Okay. And I'm simply asking, you know -- our
25 position in this lawsuit is, hey, Mr. Kidd on behalf of



Page 57
1  Travelers should have paid us on December 11th, 2018,
2  $9,048.02 for the withheld labor depreciation.
3      You know, in other words, his ACV payments should
4  not have held labor depreciation. It should have been
5  9,048.02. And I'm asking you now, did you ever pay that
6  much in total in the handling of your claim?
7      MR. ACKERMAN: Objection to form.
8      THE WITNESS: I don't know. I would have to
9  see what the total was between the two payments, so...
10 BY MR. SNODGRASS:
11  Q. Sure. Well, let's jump ahead.
12     I'm going to mark this as Deposition Exhibit
13 No. 11. And this is a copy of your declaration in this
14 case.
15     (Deposition Exhibit No. 11 was marked for
16      identification.)
17 BY MR. SNODGRASS:
18  Q. And so, is there anything in your declaration
19 that would say what the total amount of payments were?
20  A. Yep. So, there, paragraph 9.
21  Q. And what was the total amount that Travelers paid
22 on the claim?
23  A. It was 8,685, which would be less than the number
24 we were referencing on the earlier document.
25  Q. So, in other words, if Travelers had not

Page 58
1  depreciated labor, they would have received more than
2  you ever paid on the claim; correct?
3      MR. ACKERMAN: Objection to form.
4      THE WITNESS: That -- that is correct.
5  BY MR. SNODGRASS:
6   Q. Okay. And I'm going to mark this as Deposition
7  Exhibit No. 12.
8      (Deposition Exhibit No. 12 was marked for
9       identification.)
10 BY MR. SNODGRASS:
11  Q. And let's just see if we can go through this and
12 agree with the numbers.
13     The first is the ACV total you actually paid with
14 nonmaterial depreciation taken out, net of the
15 deductible, was $6,840.07; correct?
16     THE WITNESS: Sorry. Can I pause for one
17 second? I'm getting a lot of messages which I thought I
18 had turned off and it's becoming distracting. Give me
19 just a minute, please. I've got to leave this chat.
20 Sorry.
21     Okay. We're set. Sorry about that.
22     Could you please repeat the question?
23 BY MR. SNODGRASS:
24  Q. Sure.
25     I'm going to take this step by step.

Page 59
1      The ACV total that you actually paid was
2  $6,840.07; correct?
3   A. Correct.
4   Q. And that payment, I believe you said, was made on
5  December 11th, 2018; correct?
6   A. That's what it looks like, yes.
7   Q. And the ACV amount that you would have paid
8  without nonmaterial depreciation would have been
9  $9,048.02; correct?
10  A. Yeah, based on what I've seen --
11     MR. ACKERMAN: Objection.
12     THE WITNESS: -- today. Based on the
13 document that you've showed today.
14 BY MR. SNODGRASS:
15  Q. Okay. And so the difference between what you
16 paid with labor depreciation and what you would have
17 paid without labor depreciation was $2,207.95; correct?
18  A. Correct. That's the difference.
19  Q. But you did supplement -- make a supplementary
20 payment later on for $1,844.93; correct?
21  A. That is correct.
22  Q. And you made that payment on February 22nd, 2019;
23 is that correct?
24  A. You know, based on this document, yeah, that
25 sounds correct.

Page 60
1   Q. Okay. And so the total unpaid principal, even
2  today -- not counting any interest issues, the unpaid
3  principal is $363.02; is that correct?
4      MR. ACKERMAN: Objection to form.
5      THE WITNESS: You know, I don't know if I
6  would agree with that.
7  BY MR. SNODGRASS:
8   Q. Okay. What don't you agree with? The math or
9  something else?
10  A. Still -- and maybe, you know, it's the meaning of
11 "unpaid principal." But if we're, you know, in the
12 policy, we can pay up to what the insured incurred less
13 their deductible, which we did pay in full.
14  Q. Okay. Let's talk about that for a moment.
15     You --
16  A. Okay.
17  Q. You determined that ACV coverage existed;
18 correct?
19  A. Correct.
20  Q. Okay. If the Court rules that you should not
21 have withheld labor from that ACV payment, you would
22 have paid $9,048.02; correct?
23     MR. ACKERMAN: Objection. Calls for a legal
24 conclusion.
25     THE WITNESS: I believe so, yes.

Case 2:23-cv-04079-BCW  Document 26-1  Filed 08/01/23  Page 11 of 18

888-893-3767 | Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
www.lexitaslegal.com


Page 61

1  BY MR. SNODGRASS:
2     Q. Okay. Have you ever not paid somebody the total
3  amount of actual cash value that you think you owe them?
4     A. Have I ever not paid anyone the total actual cash
5  value --
6     Q. Right. Right.
7     A. No. I -- I mean, not to my -- not to my
8  knowledge. I don't think I've --
9     Q. Okay --
10    A. -- deliberately --
11    Q. Okay. Let me give you a hypothetical.
12    A. Okay.
13    Q. So let's say that under the Ledfords' policy you
14 were supposed to pay them $9,048.02. And let's say that
15 they took that check and instead of repairing their
16 house, they went on vacation to Florida. Okay?
17    Does that violate the terms of the policy?
18       MR. ACKERMAN: Objection to form.
19       THE WITNESS: I do not believe so, no.
20 BY MR. SNODGRASS:
21    Q. Because a policyholder can use a ACV payment for
22 whatever he or she wishes; correct?
23    A. That is correct.
24    Q. They can repair the house. They can pay for food
25 -- to put food on the table. Pay for college. Go to

Page 62

1  Florida. Whatever they want. That money is theirs;
2  correct?
3     A. That is correct.
4     Q. Okay. So it doesn't really matter whether they
5  had their home fixed with, let's say, an unlicensed
6  contractor -- roofing contractor that did it on the
7  cheap, or they decided to not put in a replacement oak
8  door but a replacement pine door. Whatever they want to
9  do, that replacement cost total is not going to change
10 what you owe them for actual cash value; right?
11       MR. ACKERMAN: Objection.
12       THE WITNESS: Correct. They can make a
13 claim for ACV only, or RCV.
14 BY MR. SNODGRASS:
15    Q. Correct.
16    And so the minimum you owe is the ACV; correct?
17       MR. ACKERMAN: Objection to form.
18       THE WITNESS: Yeah, to the best of my
19 knowledge, yes.
20 BY MR. SNODGRASS:
21    Q. Okay. Okay.
22    Do you know how the Xactimate depreciation
23 option settings are currently set for the Travelers
24 entities -- Travelers underwriting companies, in the
25 state of Missouri?

Page 63

1     A. It would be speculation.
2     Q. Okay. So you don't know, one way or the other?
3     A. I have a good idea, but, like I said, I haven't
4  seen that option, or paid attention to that option in
5  Xactimate.
6     Q. Well, what -- you said you had a good idea. Why
7  do you think you have a good idea?
8     A. Because I see what's depreciated on my estimates.
9     Q. And what have you seen on your Missouri
10 estimates?
11    A. So material, labor, nonequipment.
12    We depreciate overhead and profit.
13    We do not depreciate the removal of product. So
14 I guess that's one piece of labor that we would not
15 depreciate is the removal of an item such as, you know,
16 the removal of a roof.
17    Q. So, what I'm wondering is is Travelers still
18 depreciating nonmaterial in the state of Missouri?
19    A. So, some nonmaterial.
20    Q. What? What --
21    A. So --
22    Q. I -- I might have confused you. I think I have
23 based on your answers.
24    I'm just asking whether or not that depreciate
25 nonmaterial box is checked on your Xactimate estimates

Page 64

1  in Missouri still today?
2     A. You know, I -- I would think it is, but
3  they're -- again, with the removal, which I think is
4  another box, I don't believe that one would be checked
5  and that one would be, in essence, of labor cost.
6     Q. Okay. How certain are you that that depreciate
7  nonmaterial box is still checked when you're handling
8  claims in the state of Missouri on behalf of Travelers'
9  underwriting companies?
10    A. Again, to put a percentage on -- I mean, fairly
11 certain.
12    Q. Okay. How many Missouri claims do you currently
13 have?
14    A. In my inventory, 15, 10.
15    Q. And do you just leave the depreciation option
16 settings as need be set by the company for your Missouri
17 claims, or do you go in there and tinker with them
18 today?
19    A. I do not actively make changes to the
20 depreciation.
21    Q. The depreciation option settings that we looked
22 at at Exhibit 5. That's where I'm at; right?
23    A. Yes, I'm sorry. That's correct.
24    Q. Okay. Are you aware of any mistakes you made
25 when you created the estimate for the Ledfords in 2018?

888-893-3767 | Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
www.lexitaslegal.com
Case 2:23-cv-04079-BCW  Document 26-1  Filed 08/01/23  Page 12 of 18


Page 65
1  MR. ACKERMAN: Objection to form.
2  THE WITNESS: In review of the file, I think
3  I originally uploaded an estimate with no depreciation
4  applied to it. But that was caught prior to ever
5  sending the estimate to the Ledfords. So, I guess, I
6  wouldn't classify that as a mistake. So I would say the
7  answer is no, I'm not aware.
8  BY MR. SNODGRASS:
9    Q. Well, more importantly, when you were determining
10  the total amount of repair cost, the labor, and
11  materials and contractors' equipment, are you aware of
12  any mistakes you made when you calculated that amount?
13  MR. ACKERMAN: Objection to form.
14  THE WITNESS: I'm not currently aware, no.
15  BY MR. SNODGRASS:
16    Q. Did you see any -- anything in the claim file
17  where the policyholder disputed the amounts you
18  calculated for repair, for labor or materials or
19  contractors' equipment?
20    A. No.
21  THE COURT REPORTER: Mr. Snodgrass?
22  MR. SNODGRASS: Yeah.
23  THE COURT REPORTER: When you get to a
24  natural stopping place I would appreciate a 10-minute
25  break, if that's okay.

Page 66
1  MR. SNODGRASS: Why don't we take one right
2  now.
3  THE COURT REPORTER: That's perfect. Thank
4  you so much.
5  (A break was taken off the record from
6  1:37 p.m. to 1:47 p.m.)
7
8  BY MR. SNODGRASS:
9    Q. Okay. Mr. Kidd, I'm showing what I'm going to
10  mark as Deposition Exhibit No. 8.
11  (Deposition Exhibit No. 8 was marked for
12  identification.)
13  BY MR. SNODGRASS:
14    Q. This is Missouri Statute 375.1007 which defines
15  as an improper claims practice the failure to adopt and
16  implement reasonable standards for the prompt
17  investigation and settlement of claims arising under its
18  policies.
19    Have you seen the Improper Claims Practices Act
20  Statute for the State of Missouri before.
21    A. It's possible. Not recently.
22    Q. Okay. Let me ask you this.
23    Does Travelers have standards for the prompt
24  investigation and settlement of claims?
25    A. Do we have standards for the what investigation

Page 67
1  and claims? I'm sorry.
2    Q. Prompt --
3    A. Oh, prompt.
4    Q. And settlement of claims.
5    A. Yeah. So, you know, ideally, we're making
6  contact as quickly as possible. Scheduling an
7  inspection as quickly as possible, you know, and issuing
8  an accurate payment as timely as possible.
9    Q. And do you believe you met those standards as it
10  relates to the Ledford claim?
11    A. I do, yes.
12    Q. Okay. Does Travelers have any written claims
13  handling standards?
14    A. We do.
15    Q. And are you familiar with those claims handling
16  standards?
17    A. You know a lot of them, yeah, but I couldn't cite
18  them to you. But I've reviewed them numerous times over
19  the course of the last six years.
20    Q. Okay. And do you have written claims -- does
21  Travelers have written claims handling standards related
22  to proof of loss forms and when those are or are not
23  requested?
24    A. I'm not sure.
25    Q. You're not sure whether there's any standards for

Page 68
1  that or not?
2    A. I believe there's standards. I don't -- I
3  couldn't tell you if there is a written document
4  outlining these standards.
5    Q. What do you believe the standards are for when
6  you request and don't request a proof of loss form for
7  Travelers?
8    A. To my knowledge, you know, the proof of loss form
9  can be sent case by case, you know, claim by claim when
10  called for.
11    Q. Well, that's not really a standard. That's
12  willy-nilly. That's the absence of a standard.
13    Are there any standards applicable to proof of
14  loss forms? You said yes. What are those standards --
15    A. So yeah -- so --
16  MR. ACKERMAN: Objection to form.
17  THE WITNESS: -- so claims where I am
18  required to send -- well, claims that we require a proof
19  of loss from our customer on are claims that are
20  pre-appraisal. So if we've received a demand from an
21  insured or his contractor or his other appraiser
22  requesting that appraisal process, we will not move
23  forward with the appraisal process until we have that
24  proof of loss.
25

Page 69

1  BY MR. SNODGRASS:
2      Q.  For structural claims, other than where a claim
3  is in pre-appraisal mode, are there any other standards
4  applicable to when you would request a proof of loss
5  form?
6      A.  I'm sure there are.  What the situations would
7  be, you know, I couldn't say with 100 percent certainty.
8      Q.  As far as your practice, though, it sounds like
9  you only request a proof of loss form if the claim is in
10  pre-appraisal mode?
11      A.  Generally speaking, yes.  You know, have I sent a
12  proof of loss form on a claim that was not
13  pre-appraisal?  Probably.  Can I give you a specific
14  instance?  No.
15      Q.  Okay.  So I take it, then, most of your claims
16  for structural, before you make a ACV payment, you do
17  not request a proof of loss form?
18      A.  I would agree with that, yes.
19      Q.  Do you ever recall requesting a proof of loss
20  form before making an ACV payment?
21      A.  Outside of appraisal, no.
22      Q.  Did you request a proof of loss form from the
23  Ledfords?
24      A.  I don't believe so, no.
25      Q.  Did you document anything in your claim form

Page 70

1  suggesting that you requested a proof of loss form from
2  the Ledfords?
3      A.  No, I did not.
4      Q.  Were you aware when you made your ACV payment to
5  the Ledfords that you could have requested a proof of
6  loss form had you so chosen to?
7      A.  You know, at that time, I probably wasn't really
8  familiar with what the proof of loss form was.  I know I
9  wasn't handling appraisals at that period of time.  So,
10  you know, I couldn't speak to that.  I'm sorry.
11      Q.  Were you familiar with the policy form for the
12  Ledfords?
13      A.  Yes, I was.
14      Q.  Have you read the policy form before you made
15  your actual cash value payment to the Ledfords?
16      A.  Yes.  Probably not in its entirety.
17      Q.  Did you have the opportunity, if you so chose, to
18  review the policy in its entirety before you made a
19  payment to the Ledfords?
20      A.  Yes.
21      Q.  Was your decision not to pay -- was your decision
22  to withhold labor depreciation at all related to the
23  proof of loss form?
24      A.  Well, I would say it wasn't my decision.  But I
25  would also say that the -- no.

Page 71

1      Q.  I'll rephrase.
2      A.  Yeah.
3      Q.  Was Travelers' decision to withhold labor from
4  the ACV payment at all related for the proof of loss
5  form?
6          MR. ACKERMAN:  Objection to form.
7          THE WITNESS:  Again, you know, the decision
8  to apply depreciation was not made by me, so I couldn't
9  speak to whether the proof of loss had anything to do
10  with the higher-ups' decision to depreciate labor.
11  Yeah, sorry.
12  BY MR. SNODGRASS:
13      Q.  Did anybody instruct you from the higher-ups to
14  request a proof of loss form from the Ledfords?
15      A.  I don't believe so.
16      Q.  Has any Travelers person that's provided you
17  training ever told you to request a proof of loss form
18  before making an actual cash value payment?
19      A.  Again, outside of appraisal, possibly.  Not
20  frequently, but they'd be in the past.
21      Q.  So, this was asking about training and whether
22  somebody --
23      A.  Oh --
24      Q.  -- to request a proof of loss form before making
25  an ACV payment.  Do you ever recall that training

Page 72

1  existing?
2      A.  Not a training session that I can recall, no.
3      Q.  Okay.  Were you aware of whether or not the
4  Ledfords' policy allowed you expressly to request a
5  proof of loss form?
6      A.  I believe so.  You know, I knew the proof of loss
7  language was in the policy, yes.  I don't think I
8  considered it in my coverage analysis.
9      Q.  As it relates to the Ledfords' claim, can you
10  think of any reason why you would want to -- would have
11  wanted to see a proof of loss form before making an
12  actual cash value payment?
13      A.  Not as it relates to the Ledfords' claim.  You
14  know, maybe if they came back with a -- an invoice that
15  was higher than ours, but that wasn't the case.
16      Q.  Okay.  Were you satisfied with the evidence that
17  you visibly saw when you visited the Ledfords' home,
18  that their home had suffered a covered loss and that the
19  -- the damage that you saw was proof of that loss?
20      A.  Yes, I was.
21      Q.  How many times did you go to the Ledfords' home?
22      A.  Once, I believe.
23      Q.  And did you inspect the damage yourself with your
24  own eyes?
25      A.  I did.

888-893-3767 | Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
www.lexitaslegal.com

Case 2:23-cv-04079-BCW   Document 26-1   Filed 08/01/23   Page 14 of 18



Page 73

1   Q.  And when you made your Xactimate estimate, did
2   you do that all on your own based on your own
3   observations and measurements, or did you rely upon
4   information from the Ledfords in making your ACV
5   estimate?
6   A.  So, you know, I estimated the loss by myself.
7   You know, I received information from the Ledfords.  I
8   used an -- an outside application for my measurements.
9   Q.  What information, if any, did you rely upon from
10  the Ledfords when making your estimate?
11  A.  Well, specifically as it pertains to, you know,
12  depreciation and RCV versus ACV, it would be, you know,
13  how old is your roof?  Do you know the age of your roof?
14  Have you lived in that house during, you know, a roof
15  replacement?  How long have you lived in the house?
16  Questions like that.
17  Q.  Any other information that you can think of that
18  you used from the Ledfords in coming up with your ACV
19  estimate?
20  A.  I don't believe so.
21  Q.  I want to talk about Missouri regulations.
22      As part of your training at Travelers, have you
23  ever been informed of or reviewed Missouri regulations
24  about the timing of claim payments?
25  A.  Not that I can recall.

Page 74

1   Q.  Showing what I will mark as Deposition Exhibit
2   No. 9.
3       (Deposition Exhibit No. 9 was marked for
4       identification.)
5   BY MR. SNODGRASS:
6   Q.  This is Missouri Regulation 20 CSR 100-1.040
7   entitled standards for prompt fair and equitable
8   settlement of claims.
9       Have you ever reviewed this Missouri regulation
10  when handling your Missouri claims?
11  A.  I don't believe so.
12  Q.  Were you aware that there was a requirement under
13  Missouri law for the acceptance or denial of a claim
14  within a 15-day time period?
15  A.  I don't believe so.
16  Q.  Do you normally try to either accept or reject
17  claims within 15 days?
18  A.  Yeah, generally speaking, you know, when we have
19  all the information.  I would say so, yes.  I would say
20  on a roof claim for wind and hail, coverage was either
21  confirmed or denied within 15 days.
22  Q.  On the Ledfords' claim case, the claim -- the
23  coverage was confirmed on the same day, correct, that
24  you reviewed it?
25  A.  So there were -- I would have confirmed coverage

Page 75

1   for wind damage on that date of the contact.  I had not
2   yet confirmed if the damage to their roof was through --
3   was caused by wind.
4       So I was able to say, yes, there's -- you have
5   coverage on your policy for wind.  I couldn't say that
6   their damage was covered because I couldn't -- I hadn't
7   yet inspected the loss.
8   Q.  Right.  But I'm talking about once you went to
9   the site, though --
10  A.  Oh -- same day.  Yeah.  So --
11  Q.  -- you confirmed coverage on that same day;
12  right?
13  A.  Correct.  I confirmed that they had sustained
14  damage from a covered cause of loss on the day that I
15  inspected the loss.
16  Q.  And on that same day you determined the amount of
17  the loss for actual cash value; correct?
18  A.  Yes, I wrote my estimate same day.
19  Q.  And on that same day there was no further
20  information you needed from the policyholder to accept
21  or reject their claim for actual cash value; correct?
22      MR. ACKERMAN:  Objection to form.
23      THE WITNESS:  Can you repeat the question?
24  BY MR. SNODGRASS:
25  Q.  On that same day, December 11th, 2018, there was

Page 76

1   no further information you needed from the policyholders
2   to accept or reject the claim or to determine the amount
3   of actual cash value?
4   A.  Thinking back to a conversation -- I don't think
5   so.
6   Q.  Okay.
7   A.  I had already confirmed the date of loss policy
8   period and whatnot, so it was a matter of:  Was the roof
9   damaged by covered peril or not?
10  Q.  Was there a regulation 20 CSR 100-1.050 further
11  provides that if further information is needed from the
12  policyholder in the investigation or remains incomplete,
13  the policyholder needs to issue notifications within
14  45 days from the initial notification and every 45 days
15  thereafter.
16      Were you aware of that Missouri regulation?
17      MR. ACKERMAN:  Objection to form.
18  BY MR. SNODGRASS:
19  Q.  I'm sorry, Mr. Kidd, you can answer.
20  A.  I'm going to read it here.
21  Q.  Sure.  I can make it bigger for you.  Can you see
22  it now?
23  A.  I can.  Thanks.
24      Yes, I am aware of this Missouri regulation.
25  Q.  Okay.  You certainly did not send the Ledfords

888-893-3767                Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
www.lexitaslegal.com
Case 2:23-cv-04079-BCW   Document 26-1   Filed 08/01/23   Page 15 of 18

Page 77

1   any letter during your handling of the claim telling
2   them that you needed further information to accept or
3   deny their claim; correct?
4       A. Correct. Yeah.
5       Q. So there was no point in time where the claim was
6   pending. In fact, didn't you close your file
7   immediately after making the December 11th, 2018,
8   payment?
9       A. Correct. So the only time coverage for their
10  roof was in question was before I had confirmed that
11  there was damage caused by covered peril. Once I
12  confirmed there was covered damage, I issued the
13  payment, sent a letter, and then closed the claim
14  pending a final invoice.
15      Q. What are the standards at Travelers for when you
16  close a claim, though, because, correct me if I'm wrong,
17  but you did close this claim file immediately after
18  making the ACV payment; correct?
19      A. I believe I did, correct.
20      Q. Okay. What are the standards for that; in other
21  words, why did you close your claim file immediately
22  after making your ACV payment?
23      A. Still, I don't know if this is for every claims
24  office, but on our team in the upper Midwest, if there
25  was no additional actionable information, we can close

Page 78

1   that claim pending receipt of -- and a final invoice.
2       At that time we don't know if they're making a
3   claim for RCV, or if they're making a claim for ACV.
4       Q. Okay. But once you issue your ACV, you said if
5   there's no immediate actionable information, you can
6   close your claim.
7       What is -- what are some examples of immediate
8   actionable information that would preclude you from
9   closing your claim?
10      A. Maybe actionable information was the wrong way to
11  phrase that, but if there's nothing else that needs to
12  be done to bring that file forward, then we will close
13  the claim.
14      Q. Okay.
15      A. They have not made a claim for RCV, so we've
16  closed the claim.
17      Q. What if the policyholder disputes your ACV
18  payment? Would you close your claim file?
19      A. I would not.
20      Q. And why would you not close your claim file if
21  the policyholder disputed the ACV payment?
22      A. So, again, you know, thinking hypothetically, if
23  there is a disagreement, then I'm not going to issue
24  payment. I will do my best to resolve whatever the
25  difference is with the insured, with the contractor

Page 79

1   prior to issuing payment.
2       Q. Okay. So here as far as you are concerned, the
3   Ledfords hadn't raised any objection to your ACV payment
4   on December 11th, 2018, and, therefore, you went ahead
5   and closed your claim file; correct?
6       A. Yeah, to the best I can recall.
7       Q. I'm showing you what I will mark as Deposition
8   Exhibit No. 10.
9           (Deposition Exhibit No. 10 was marked for
10          identification.)
11  BY MR. SNODGRASS:
12      Q. This is the certified copy of the policy for the
13  Ledfords that was produced to us. I'd like to draw your
14  attention to page 24 of this PDF and highlighted
15  portion.
16          This is in the Conditions of the Policy, and
17  under 2H, it says, "Send to us within 60 days after our
18  request, your signed, sworn proof of loss, which sets
19  forth to the best of your knowledge..."
20          And then it goes on from there.
21          Do you see that?
22      A. I do.
23      Q. So, you have -- you did not send the Ledfords --
24  or you did not request that they submit a proof of loss;
25  correct?

Page 80

1       A. I don't believe so, no. I did not.
2       Q. And this is just a standard HO-3 policy form;
3   correct?
4       A. If you could scroll down, I could -- Well...
5           So this looks to be the HO-3 (10-06) base policy.
6       Q. Okay. And so back to the same question. This is
7   just the HO-3 policies; correct?
8           MR. ACKERMAN: Objection to form.
9           THE WITNESS: I believe so, yes.
10  BY MR. SNODGRASS:
11      Q. Okay. And you were familiar with the HO-3 policy
12  form before you handled the Ledfords' claim; correct?
13      A. I was.
14      Q. And, in particular, you were aware of the
15  language in the HO-3 form that allowed you to request a
16  signed, sworn proof of loss form prior to making your
17  ACV payment; correct?
18      A. Yes. I knew the language existed, yes.
19      Q. But despite knowing that you had the right to
20  request the proof of loss form, you chose not to request
21  it, and make the ACV payment instead; correct?
22          MR. ACKERMAN: Objection to form.
23          THE WITNESS: I wouldn't say I made, you
24  know, a conscious choice, okay, I'm not going to send
25  the proof of loss on this. There wasn't, you know, a

888-893-3767 | Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
www.lexitaslegal.com

Case 2:23-cv-04079-BCW   Document 26-1   Filed 08/01/23   Page 16 of 18



**Page 81**

1 concern or an issue raised that would necessitate for me
2 to send the proof of loss.
3 BY MR. SNODGRASS:
4   Q. Well, if it wasn't your decision not to request
5 the proof of loss form, who's decision at Travelers was
6 it not to request the proof of loss form?
7   A. I guess I should say that, well, ultimately, it
8 was my decision, but it was not a conscious decision
9 that, okay, I'm not going to send this form. It's not
10 needed.
11   Q. What do you mean it wasn't a conscious decision?
12 You testified, I believe earlier, that you were aware
13 you had the right to do it, and you I'm sure were
14 aware --
15   A. Sure -- I'm was --
16   Q. Hold on. Let me finish.
17   A. Yeah. Sorry.
18   Q. You were making an ACV payment so how was this
19 not a conscious decision? Did you just, oops, I forgot
20 that I had -- could have requested a proof of loss form?
21 Is that what you're saying?
22   A. Typically, there are, you know, certain red flags
23 or indicators that could make -- tip us off to say,
24 okay, maybe we should send a proof of loss form.
25     On, you know, a claim of this nature, it -- I

**Page 82**

1 never saw a need.
2   Q. Okay. I'd like to turn your attention a little
3 bit lower to this paragraph, the last payment paragraph.
4 And, in particular, the language says, "Loss will be
5 payable 60 days after we receive your proof of loss and
6 reach an agreement with you, there is an entry of a
7 final judgment, or there is a filing of an appraisal
8 award with us."
9     Do you see that language?
10   A. I do.
11   Q. And were you familiar with this HO-3 language?
12   A. I was.
13   Q. And you would agree with me that this language
14 doesn't even apply in the first instance because you
15 never requested a proof of loss form from the Ledfords;
16 correct?
17     MR. ACKERMAN: Objection. Calls for a legal
18 conclusion.
19     THE WITNESS: I'm going to read this and
20 then I may have you ask the question again.
21 BY MR. SNODGRASS:
22   Q. Sure.
23   A. Okay. So, I'm sorry, what was your question?
24   Q. Sure.
25     This language never came into effect because the

**Page 83**

1 language after we received your proof of loss form
2 didn't become applicable because, as it said in the
3 conditions, you never requested a proof of loss form in
4 the first place; correct?
5     MR. ACKERMAN: Objection. Calls for a legal
6 conclusion.
7     THE WITNESS: So, if that's, you know, how
8 the policy would be legally interpreted -- you know, I
9 agree that we never sent a proof of loss.
10     So if we scroll down just a bit, please.
11     You know, if it's a legal conclusion that
12 that 6 is only -- that's predicated on H above.
13 BY MR. SNODGRASS:
14   Q. Well, wouldn't that seem to make sense? How can
15 you withhold payment for not receiving a proof of loss
16 form if you never request a proof of loss form or give
17 them a proof of loss form in the first instance?
18     MR. ACKERMAN: Objection. Calls for legal
19 conclusion.
20     THE WITNESS: And I guess you lost me there.
21 What exactly was the question?
22 BY MR. SNODGRASS:
23   Q. How can the last payment paragraph come into
24 effect, if you never request a proof of loss form nor
25 give the policyholder a proof of loss form?

**Page 84**

1     MR. ACKERMAN: Objection. Calls for legal
2 conclusion.
3     THE WITNESS: Yeah, I'm afraid I wouldn't be
4 able to answer that question. Not sure I could answer
5 that question.
6 BY MR. SNODGRASS:
7   Q. You're not sure whether or not this paragraph is
8 relevant if you never request a proof of loss form?
9   A. Legally speaking, no.
10   Q. Okay. I'd like to go back to your declaration in
11 this case which I've marked previously as Deposition
12 Exhibit No. 11.
13     First off, this declaration is undated. When did
14 you draft this -- when did you sign this declaration?
15   A. I couldn't tell you the exact date.
16   Q. Okay. Did you draft any particular portion of
17 this declaration yourself?
18   A. I reviewed it and signed it, I -- no, I did not
19 draft any portion of it other than my signature.
20   Q. Who gave you this declaration to sign?
21   A. Claim legal. I believe it came from Mr. Smith.
22   Q. Okay. And --
23   A. I don't know if it came from Mr. Smith, but I do
24 recall sending it to Mr. Smith.
25   Q. Okay. And had you reviewed the claim file prior

888-893-3767 — Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F — 17 of 18
www.lexitaslegal.com
Case 2:23-cv-04079-BCW   Document 26-1   Filed 08/01/23   Page 17 of 18

LEXITAS

Page 85

1 to signing this declaration?
2    **A. Yes, I had.**
3    Q. Okay. Were you aware when you signed this
4 declaration, that the issue in case was your -- was the
5 company's depreciation of nonmaterials?
6    **A. Yes, I believe so.**
7    Q. When did you first learn about this lawsuit?
8    **A. Honestly, I don't remember. Sometime over the**
9 **last three months, I would say.**
10    Q. I want to talk to you about paragraph 6 in this
11 declaration and, in particular -- I'm sorry.
12 Paragraph 9 in this declaration.
13    You say after issuing the second payment, there
14 was no remaining depreciation taken on that -- on this
15 claim.
16    Do you see that?
17    **A. Paragraph 9?**
18    Q. Yeah.
19    **A. Yep, I do.**
20    Q. Okay. Would you agree with me that that
21 statement is only correct if Travelers depreciated
22 labor? In other words, if Travelers did not depreciate
23 labor and as was shown in Exhibit 12, the damages
24 summary, if they did not depreciate labor, there still
25 would be outstanding depreciation on the claim; correct?

Page 86

1    MR. ACKERMAN: Objection.
2    **THE WITNESS: Sorry. Ask the question one**
3 **more time.**
4 BY MR. SNODGRASS:
5    Q. Sure.
6    You say there was no remaining depreciation on
7 the claim after you made your RCV payment; correct?
8    **A. Correct.**
9    Q. Okay. If we go to the damages summary exhibit,
10 Exhibit 12, that statement is only true if Travelers
11 depreciated nonmaterials; correct?
12    MR. ACKERMAN: Objection.
13    **THE WITNESS: So, what I originally wrote**
14 **was just my estimate. Had that original estimate been**
15 **more accurate with the final invoice received, I think**
16 **we still would have -- the total paid would have**
17 **remained the same, because our depreciation -- excuse**
18 **me -- our withheld depreciation would have gone down.**
19    **Does that make sense?**
20 BY MR. SNODGRASS:
21    Q. No.
22    I -- I think we covered this, and we can go
23 through it again. But your ACV payment, had you not
24 depreciated nonmaterials, would have been $9,048.02;
25 correct?

Page 87

1    **A. Correct. Based off of my initial estimate, yes.**
2    Q. Okay. You never paid that amount; correct?
3    **A. Correct. We paid less than that with the final**
4 **depreciation payment.**
5    Q. Okay. Let me switch gears here.
6    The claim platform that Travelers uses, is it
7 your understanding that that's a generic claims
8 management software program available commercially, or
9 is it a internal proprietary software program exclusive
10 to Travelers, if you know?
11    **A. I've always wondered, but I don't know. I'm not**
12 **sure if it's proprietary or not.**
13    Q. Okay. When you were working at Pacesetter, did
14 you have access to claims management software?
15    **A. I don't believe so.**
16    Q. When you were at Pacesetter, could you get access
17 to other carriers' claims management software systems?
18    **A. I don't believe so, no.**
19    Q. What carriers were you handling claims on behalf
20 of when you worked at Pacesetter, to the extent you can
21 recall?
22    **A. Safeco**
23    Q. Any others? Any -- were they all Liberty Mutual
24 entities or any other entities --
25    **A. I just remember it was Safeco.**

Page 88

1    Q. Okay. All right. Let me ask you this.
2    Are you able to determine through the data in the
3 claim platform when a structural property damage claim
4 is made?
5    MR. ACKERMAN: Objection to form.
6    **THE WITNESS: Am I able to see when the**
7 **claim came in?**
8 BY MR. SNODGRASS:
9    Q. Yes.
10    **A. Yes, you can see that.**
11    Q. Okay. Are you able to determine somehow through
12 claim platform whether or not a claim is for structural
13 damage?
14    **A. Not entirely. It's claim by claim. It all**
15 **depends.**
16    Q. Well, in other words, are you able to determine
17 when you go into claim platform what a claim is for? Is
18 it for a bicycle? Is it for a house? You can't tell
19 that in claim platform?
20    **A. Not always. Not initially. You know, once I**
21 **make contact with the insured, of course.**
22    Q. No, no, no. I understand that. Okay. Let me
23 put it this way.
24    Once a claim file is closed and you go back into
25 a claim file, are you able to determine whether or not a

888-893-3767   Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
www.lexitaslegal.com     LEXITAS

Case 2:23-cv-04079-BCW    Document 26-1    Filed 08/01/23    Page 18 of 18